### THE HAROLD.

### THE DAVID CROCKETT.

### MANSON et al. v. THE HAROLD et al.

### NEALL v. MANSON et al.

#### (District Court, S. D. New York. January 11, 1898.)

COLLISION—SAIL VESSEL—TUG AND TOW 2,600 FEET LONG AT SEA—FOG.

The tug Harold was proceeding southward past Cape Charles with two barges in tow, each over 200 feet long, and each upon a separate hawser about 1,100 feet long behind the tug. The H., hearing the fog horn of the schooner M. bound north nearly ahead, starboarded her wheel, and passed some 300 or 400 feet to the eastward of the schooner, but the schooner collided with the Crockett, the first barge, about 1,100 feet behind the H. Lights could be seen only a few hundred feet distant. No signal was given by the tug, indicating her change of course to the schooner, nor any signals to the tow to co-operate with the tug by starboarding, nor was any signal given from the barges to indicate their positions. There was no lookout

forward on the Crockett to observe the change in the lead of the tug's hawser to port, and in consequence of this, the Crockett, when the schooner's lights were first seen, erroneously put her wheel to port, in order to go to the westward of the schooner, though she very quickly changed her wheel to starboard. The schooner was going under nearly all sail at about six miles an hour. *Held,* that the navigation of each of the vessels was blamable; that navigation in fog with such long tows without previous arrangement for signals to indicate the position of the tow, or to secure co-operation by the tow with the tug in keeping out of the way, is dangerous, and at the risk of the tug, whose legal duty it is to keep the whole fleet out of the way under the rules of navigation; since without such previous provisions, it is impossible for the tug to keep the fleet out of the way of sailing vessels, or to give the latter sufficient opportunity to keep away themselves. *Held* also that the Crockett was here liable for negligence in her own part of the navigation, and that the schooner was also liable for immoderate speed.

Libel and cross libel for damages caused by collision.

Carter & Ledyard and Edmund L. Baylies, for Manson and others.
Robinson, Biddle & Ward, for the David Crockett.
Carpenter & Park, for the Harold.

BROWN, District Judge. The above libel and cross libel grow out of a collision, which took place a little after 10 p. m. on April 8, 1897, in a dense fog, about 15 miles to the northeast of Cape Charles, between the three-masted schooner Agnes E. Manson, bound north, and the barge David Crockett, in tow of the tug Harold, bound south, by which both vessels sustained some damage.

The tug Harold had two barges in tow; the David Crockett on a hawser about 1,100 feet behind the tug, and the barge Marion behind the Crockett on a hawser of about the same length. The Harold was a powerful tug, about 130 feet long with two masts and sails; and each barge was 218 feet long or over. The David Crockett was an old clipper ship turned into a barge, with three masts and fore and aft sails. Both barges were light. The schooner was 174 feet long and was loaded with 1,360 tons of coal. She was making a course N. E. by N. on the starboard tack, with a good wind from about S. S. E., nearly three points aft of abeam. She had all sails set except two topsails, which were taken in when the fog came on about an hour and a half before the collision. At collision she was making about six knots an hour. The fog was so thick that lights could not be seen more than a few hundred feet. The tug was headed S. W. by S. The fog horn of the schooner was heard, as the pilot says, 1½ points on his starboard bow; this estimate was incorrect. The result shows that the schooner must have been very nearly directly ahead. On hearing her fog signals, the pilot of the tug starboarded his wheel so as to head 2 points more to the southward, and steadied at S. by W. under one bell, making probably about 3½ knots speed. He heard one or two additional fog signals from the schooner, and then made her green light on his starboard bow, and passed to the eastward of her, at a distance estimated at about 300 to 400 feet. When abeam and faintly seeing her sails,

he twice hailed the schooner, shouting that he had barges astern and that the schooner should keep off. Those on the schooner heard several fog signals of the tug, at first apparently a little on their starboard bow, and afterwards saw the tug's vertical white lights indicating a tow, and soon after her green light in the same direction. The lookout of the schooner testifies that he heard from the tug when abeam, the hail to keep off. The master and mate testify that they heard some shouting, but did not hear what the hail from the tug was, nor the report of it by the lookout. The mate at about the same time told the wheelsman to keep his course. A few moments afterwards the green light of the barge David Crockett was made a little on the schooner's port bow, whereupon the schooner's wheel was put hard a-starboard, and the schooner paid off two points, enough to bring the barge a little on the schooner's starboard bow, when the collision took place, the stem of the barge striking the anchor stock on the schooner's starboard side and badly scraping her side. The barge's stem was knocked to port, and some leaking caused.

There is much less conflict than usual in the testimony concerning the facts of this case. The accounts given by the different witnesses, do not much differ. The master of the schooner, indeed, contends that the tug did not change two points to the southward, as the latter's evidence shows that she did; but that she continued on a course about parallel to his own. There is no sufficient reason, however, to discredit the tug's witnesses in this respect; and it agrees better with the other facts of the collision, since it is not probable that the Crockett, except through the tug's starboarding, would have been as much as three or four hundred feet to the westward of the position of the tug, having reference to the line of the schooner's course and of the tug's course shortly before. What is specially noticeable in the case is, the entire disregard by each of the three vessels of some of the well-known rules of navigation.

(1) The schooner had nearly all sails set in a fresh wind, and was going at a speed of six knots; this plainly was not the moderate or reduced speed required in fog by article 13. The City of New York, 15 Fed. 628; The Martello, 34 Fed. 75; The Rhode Island, 17 Fed. 555, 558; The Wyanoke, 40 Fed. 704; The Zadok, 9 Prob. Div. 114.

(2) The Crockett, though having her sails set and being 1,100 feet behind her tug, had no lookout forward, and paid little attention to what was ahead of her. There were but two men on deck, both of whom were in the pilot house, which was far aft near the mizzen mast, and no attention was paid to the lead of the hawser which should govern the steering of the tow. Consequently when the red light of the schooner was first seen and seen later than it should have been seen, a few hundred feet away and nearly ahead, the barge not knowing on which side of the schooner her hawser led, wrongly put her wheel hard a-port, so that if the schooner had not by starboarding fortunately headed her off, she would have raked and probably sunk the schooner by her hawser.

(3) The tug, though making the fog horn of the schooner nearly

ahead, did not stop her engines, as required, until the position of the schooner could be certainly ascertained. The Martello, 153 U. S. 64, 14 Sup. Ct. 723. Had she done even this, it is probable that the collision would have been avoided, through the slower movement of the Crockett and the greater time for the schooner to have got away under her starboard wheel. By the tug's stopping and slackening the hawser, moreover, in such situations the privileged vessel might often escape harm by crossing the hawser, when she would otherwise be damaged or sunk. The tug again though she herself starboarded, which the result shows was necessary, in order to clear the schooner, gave no signal to the barges to starboard also, though immediate starboarding was equally necessary to enable them to avoid collision, and was the only means by which the tug could keep so long a tow out of the way of the schooner.

There is no doubt that the fresh wind on the port side of the barges, which were light and high out of water, caused them to sag somewhat to the westward. This made it more dangerous to the schooner for the tug to go on the windward side of her, as the barges were thus the more likely to be encountered by the schooner.

From this sagging of the tow to leeward, there was special reason why the tug should have ordered the barges, by such notice as was practicable, to follow the tug, and to starboard immediately when the tug found that starboarding was necessary to avoid the schooner. The pilot of the tug testifies that they had a code of signals, by the use of the steam whistle, for giving to the barges various directions, such as casting or weighing anchor, to set or take in sail, etc.; but he had no signal arranged for directing the barges to port or to starboard the wheel. He states, however, that it was understood that several short blasts in succession was a signal that the barges should give special attention to follow the tug's hawser. Had that signal been given, it would have been better than none at all, and might have been sufficient for this occasion had the barge been provided with any lookout forward, as was her duty, to see how the hawser was leading. The captain of the Crockett testifies that some other tugs by which he has been towed, have signals for an order to the barge to port or to starboard the wheel. The barges were also provided with steam whistles; but they are not in the habit of using the whistle to indicate their position in a fog, and did not do so at this time.

Had this barge indicated her position by any sound upon her whistle, there is no doubt that the collision would have been avoided. The schooner, though knowing that the tug which she had just passed had a tow, did not know and had no suspicion that the tow was tailing considerably to the westward of the line of the tug, so as to bring the tow upon the schooner's port bow. Any whistle from the barge would have made this fact known to the schooner much earlier than the time when the barge's port light was seen, and in time to enable the schooner by starboarding to avoid collision.

In the case of The Whitney and Shamokin, 77 Fed. 1001, a similar difficulty was experienced by the steamship Whitney in approach-

ing Pollock Rip Lightship going south, while a tow, similar to this, was rounding that point and going north. It was there considered that the tug and tow were bound to provide for indicating the tow's situation by some signal or else previously to have come to anchor. The cases of The Raleigh, 44 Fed. 781, and The City of New York, 1 C. C. A. 483, 49 Fed. 956, were referred to, and the ruling in the former case requiring such signal was regarded as most properly applicable to the case; and the same rule should, I think, be applied here.

Without some signal indicating the position of the tow in fleets made up like this, it is impossible for a crossing vessel in fog to know which way the tow is tailing, or where its boats are located, and impossible, therefore, to make use seasonably and intelligently of such measures as are practicable to the sailing vessel and necessary to save life and property. The dangers of such navigation in fog with tows on such long hawsers and without any such precautions, seem to me too great to be justifiable, in the absence of any statutory recognition. The mere recognition of towage at sea is no recognition of the lawfulness of towage on such long hawsers in fog; and the practice is too recent to have acquired validity as a customary usage of the sea. The new 15th article permits a signal from the tow, and with such long tows and hawsers in fog signalling seems to me a plain requirement of ordinary prudence.

But if such navigation by tug and tow be deemed justifiable, it is, at least, subject to the established rules of navigation. The Maverick, 84 Fed. 906. Nothing in the rules releases the tug from the obligation of the thirteenth rule to keep herself and her tow, as one vessel, out of the way of sail vessels. The Civilta, 103 U. S. 699. It is urged that this is impossible in cases like the present. But if a tug and tow voluntarily enter upon towage in such form and manner as to make it impossible for them to keep out of the way and at the same time impossible for the privileged vessel when meeting them, through lack of timely knowledge of the tow's position, to keep away by any care of her own, must not such navigation be at the risk of those who engage in it? It is at least incumbent upon them, as it seems to me, to take reasonable precautions by the use of such signals as are permissible and as the evidence shows are perfectly practicable, to indicate their position and to secure concert of action in steering so as to perform the statutory duty of keeping out of the way, as well as to aid the privileged vessel to do seasonably what she can to avoid collision.

In the towage cases before the supreme court it has been adjudged (The Civilta, supra; The Virginia Ehrman, 97 U. S. 309) that notwithstanding the general responsibility of the tug, the tow also is bound to be vigilant in the use of all proper means at her command to avoid collision. In those cases the hawser was but from 200 to 300 feet long, about one-fourth the length of the hawser in the present case. In the case of The Virginia Ehrman, where the tow was on a hawser of but 50 fathoms, both the tug and the tow were held in fault for running into a dredge at anchor in a channel way; the tug, for not giving the dredge a wider berth, and the ship, because

she "had no lookout, and her helm was put to port when it should have been put to starboard." That is precisely the case with the barge in this instance. She had no lookout, and at first ported when she ought to have starboarded, through failure to keep watch of her own hawser.

In the case of The Civilta, 103 U. S. 699, a ship was in tow of a tug on a hawser 270 feet long, less than one-fourth of the hawser in this case. The pilot who had the lawful control of the navigation, was on board the ship, and did not interfere with the navigation of the pilot of the tug. The ship ran into a schooner, which it was held had not changed her course. Both the ship and the tug were held in fault for not properly observing the schooner, and not keeping away in time. The tug was held responsible for the general navigation, and because the pilot, who was on the ship, and "who was in charge of both ship and tug, *neglected to give the necessary directions to the tug*, when he saw or ought to have seen, that no precautions were taken by the tug to avoid the approaching danger."

These cases fully recognize and establish the duty of both the tug and the tow to keep a proper lookout, to be vigilant in doing what is in the power of each to avoid collision, as well as the duty of the pilot in charge of the whole, to communicate such orders as may be necessary between tug and tow.

In like manner it was the duty, as it seems to me, of the pilot on board the tug, who in this case was in charge of both tug and tow, to give notice to the tow, as a part of his duty to keep the whole fleet out of the way, that she should starboard her wheel, as above intimated, at the same time that the tug starboarded her wheel; inasmuch as in no other way could the tow, a half mile long, help tailing across the line of the schooner's course, with collision as the almost inevitable result. Provision could as easily have been made for such necessary communication between the tug and tow as to steering, as was made in regard to sails and anchors.

The tug, moreover, did not give to the schooner the signal of two blasts, as she might have done, to show that she was turning to port, which would further have put the schooner on her guard as to the position of the tow behind. This was specially commented on by the court of appeal in The Martello, 39 Fed. 509.

I think the tug is, therefore, liable for not keeping the tow out of the way, as she was required to do by the thirteenth article, and for not making use of any of the means above stated in the endeavor to do so.

The tow is liable for neglect to keep any lookout forward, or any watch upon the lead of the tow line to guide her own steering. The tug's lights could not be seen from the barge and the only guide of the barge in steering was the direction in which the hawser led and the sound of the tug's whistles, the latter a most uncertain reliance. Through lack of any lookout forward and consequent want of knowledge, at the moment the schooner's light was seen, in which direction the hawser led, the Crockett wrongly ported when she ought to

have starboarded. A proper lookout forward would not only have reported the schooner earlier, but would have previously noticed the lead of the hawser to port and directed a corresponding starboarding of the barge's helm,—both important factors in avoiding collision.

I do not feel warranted in exempting the schooner from blame on her contention that her excessive speed did not contribute to the collision. Even if it be assumed that the schooner, if going three or four knots only, instead of six, would not have been able to turn any more to the westward under her starboard wheel, it is certain that the barge would have had longer time in which to correct her error in first porting, and therefore more time to draw away to the southward both by her own subsequent starboard wheel, and by the longer duration of the pull of the tug to the southward; and had collision still have taken place, it must have been comparatively slight, and the damage little or none. A very little change of the barge's head to the southward would have avoided collision. Probably 10 seconds more time would have been sufficient. More than this difference would have been made had the schooner been going at a speed of only from three to four knots. It is probable that the barge's light was seen at least 500 feet distant, as the schooner after seeing it was able by starboarding to change her heading two points to the westward. As she was a large schooner 174 feet long and deeply loaded and pays off much more slowly than she luffs, the time necessary to change two points under a starboard wheel must have been over half a minute, which would give at least 500 feet for the approach of the vessels during the interval. This would indicate that the barge's green light was seen when the schooner was about midway of the tug's hawser, or about a half minute after she passed the tug. I am not altogether satisfied as to the reasonable care of the schooner in proceeding for half a minute without change of helm after hearing the shouts from the tug, even though the hail was not precisely understood. For the schooner knew from the tug's lights that there was a tow behind, which in the fresh wind would naturally swing to the westward of the tug's course, and the only reasonable inference from the hail was that the tug meant to give at least some caution to the schooner, which would naturally import a suggestion to her to keep off to the westward.

The damages and costs should be divided equally among the three vessels, the faults of each being independent of the others.