## THE IDA B. CONWAY.

District Court, D. Maryland.   October 18, 1927.

No. 1423.

1. Collision ⬤➾75(2)—Schooner propelled by small power boat made fast to her stern is a "steam vessel" (Pilot Rules [33 USCA § 154 et seq.]).

A schooner being propelled by a small power boat made fast to her stern is for the time a "steam vessel," within Pilot Rules (33 USCA § 154 et seq. [Comp. St. § 7872 et seq.]) as to lights.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Steam Vessel.]

2. Collision ⬤➾75(2)—Schooner being operated as a steam vessel, carrying only one white light astern, held to violate rule (Pilot Rules, art. 2 [f], being 33 USCA, § 172).

Schooner being operated as a steam vessel, by carrying only one white light astern, *held* to violate Pilot Rules, art. 2 (f), being 33 USCA § 172 (Comp. St. § 7876).

3. Collision ⬤➾103—Schooner propelled by motorboat astern, which could not check speed or move astern quickly, held in fault for collision.

Schooner being propelled in a canal at night by a small power boat astern, and which had virtually lost her steerageway, so that she could not check her speed or move astern, *held* negligent, and in fault for a collision.

4. Collision ⬤➾103—Motor cruiser held chargeable with contributory fault for collision with meeting schooner in canal at night.

Motor cruiser *held* chargeable with contributory fault for collision in a canal at night with meeting schooner, for not being on her own side of the fairway and failing to keep proper lookout.

In Admiralty. Suit for collision by C. A. Wigmore against the schooner Ida B. Conway. Decree dividing damages.

Lord & Whip, of Baltimore, Md., for libelant.

John Henry Skeen, of Baltimore, Md., for respondent.

COLEMAN, District Judge. This case involves a collision at night which occurred in the Chesapeake & Delaware Canal, near Delaware City, Delaware. Libelant's motor cruiser Aloha, some 50 feet long, 10 feet beam, was bound down towards Baltimore, when it collided with respondent's schooner Ida B. Conway, some 84 feet long, 24 feet beam, laden with oyster shells, bound in the opposite direction towards Philadelphia. So much of the facts as appear to be uncontradicted are as follows:

The night was calm, clear, and starlit. The width of the channel of the canal at the point where the collision occurred was 123 feet, and was some 400 yards east of a drawbridge, through which the schooner had passed and the Aloha was preparing to enter. The schooner's top sides were white. Her sails had been lowered, and she had been propelled through the canal in a manner quite common in this locality, namely, a yawl boat, with a small gasoline engine, was made fast to the schooner's stern and propelled her by pushing. While it was possible to reverse the engine in the yawl boat, it was impractical to attempt it, because of the difficulty in steering. As the schooner in this manner went through the draw, the engine in the yawl boat was stopped, and so it remained until the accident, so that the schooner was drifting along very slowly at the time, with her master at the wheel, a lookout in the bow, and the mate operating the yawl boat. Proper side lights were carried on the schooner, and there was a white light on her stern; but she did not otherwise comply with article 2, section F, of the Pilot Rules, respecting central range of white lights. None of the three persons referred to had a pilot's license, but they were accustomed to navigate these waters. With respect to the Aloha, she was carrying all requisite lights and was being operated by her owner, who also had no pilot's license, but had been through this canal a number of times in the same craft. She was steered from a bridge about amidships. The draw was some 30 feet wide, swinging on a pivot, and was marked by three red lights, one on each abutment, and one on the center of the draw when closed, which changed to a green light when the draw was open, leaving the passage between the two other red lights.

There is, as usual in such cases, much conflict of testimony as to the real cause of the collision. The sum and substance of libelant's contention is that he was navigating his boat with due care, and mistook the port running light of the schooner for a red light on the drawbridge, and that, had the schooner been properly navigated, had she kept to her side of the canal, and had she been carrying the proper lights, this mistake on his part would not have occurred. For the schooner, the claim is made that the direct cause of the collision was faulty navigation on the part of libelant, who, as it is claimed, did not keep his boat sufficiently to starboard when they were about to pass each other, and in addition that, when the collision appeared imminent, libelant, instead of avoiding it, as he might have done by reversing his engine and going straight astern, first swung the Aloha to starboard and then reversed, rendering it

impossible for the schooner to get out of her way. The bowsprit of the schooner struck a port stanchion of the Aloha a little aft of amidships, the impetus swinging the Aloha about and finally running her aground, stern first, on the south—that is, the schooner's—side of the canal. The rudder post of the Aloha was broken and she suffered other damage; the total claim being in the sum of $1,000.

It appears that a steamer of the Ericsson Line bound for Baltimore was proceeding ahead of the Aloha, about 300 or 400 yards distant, and had already passed through the draw and was in the lock on the other side. Libelant claims that he had stopped his engine, and upon seeing the moving red light he thought that it was the central red light upon the draw, and that the draw was being closed against him, whereupon he sounded three blasts to indicate that he wanted it to be opened, so that he could pass through. Just before the vessels struck, the master of the schooner claims to have blown a warning blast on a small fog horn, and also to have called out a warning to libelant.

[1] The first question to be answered is whether the schooner was a steam vessel or a sailing vessel, because a determination of this question has a direct bearing upon the matter of lights. Every vessel under steam, whether under sail or not, is to be considered a steam vessel, and a steam vessel is deemed to be any vessel propelled by machinery. Pilot Rules (30 Stat. 96 [33 USCA § 154 et seq.; Comp. St. § 7872 et seq.]). Whether the method of propulsion used in this case—that is, the pushing of the schooner by a small power boat made fast to the stern, which is quite common in the waters in and around Chesapeake Bay—brings the schooner within the classification "steam vessel" appears never to have been the subject of adjudication. However, the Supreme Court has decided that a ship and a tug towing her are, in contemplation of law, but one vessel under steam. The Civilta and The Restless, 103 U. S. 699, 26 L. Ed. 599. And, similarly, that a tug and a barge are, in contemplation of law, but one vessel, constituting together the effective instrumentality in construing liability under the Harter Act (46 USCA §§ 190–195 [Comp. St. §§ 8029–8035]). Sacramento Navigation Co. v. Salz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663. By analogy, therefore, if not by direct authority, these cases would seem to uphold the conclusion which the court adopts that the schooner in the present case was, at the time, a steam vessel. Also, it is not questioned that she was under way.

[2] Turning, then, to the question of lights, while the schooner was carrying the proper side lights, she violated article 2, subsection F of the Pilot Rules (30 Stat. 96 [33 USCA § 172; Comp. St. § 7876]), in that she had only a white light at the stern, instead of a central range of two white lights. It is to be noted, before passing from this subject, that, even if the schooner be deemed a sailing vessel, then she must be declared to have violated Article 5 of the Pilot Rules (30 Stat. 97 [33 USCA § 174; Comp. St. § 7878]), because a sailing vessel under way must not carry a white light, as was done in the present case. If considered a sailing vessel, then we still have to deal with the yawl boat, which had no white light astern, so apparently in violation of the motorboat rules. In other words, from any aspect, the legal requirement as to lights was not met.

The question now arising is this: Granting that the schooner was violating the requirements as to lights while under way, are we to conclude from this, without more, that there was negligence on the part of the schooner? While it is true that the burden of proof is on the vessel whose lights are attacked to show affirmatively that her lights were properly placed and burning at and just before a collision, The Conoho, 24 F. 758; nevertheless, mistaking lights of a vessel for lights on a draw on a clear, calm night, if it results in a collision, or misjudging distance of lights on another vessel under such conditions, resulting in collision, may prove negligence on the part of those so misjudging, The West Hartland (C. C. A.) 2 F.(2d) 834, 1925 A. M. C. 47.

[3] So it becomes necessary now to turn to the question of navigation, and consider first, whether or not the schooner was improperly navigated. That she was allowed virtually to lose her steerageway was not negligent under the given circumstances, but there does appear to be an unwarranted element of negligence in the operation of a boat of this size and tonnage by such means that, should it become necessary suddenly to check her headway, or move her astern, this could not be done. In the present case, it is not clear to the court but that, had the schooner been propelled by an engine of her own, or had she been pushed along in a way which would have enabled the propelling craft to move astern as well as forward, the accident might have been avoided.

[4] Turning now to the question of negligence on the part of the Aloha, the court is of the opinion that some negligence is also to be imputed to libelant in his operation of

her. It is to be noted that, while he says he at all times kept well over to his side of the canal, he was unable to testify just how far he was from the shore. It is more likely, in the opinion of the court, that the schooner was keeping to her side of the canal better than the Aloha was keeping to her own side, because the schooner had just passed the Ericsson Line steamer, a rather large vessel. While the libelant testified that he could not see the schooner until it was almost upon him, although it was painted white and the night was clear, respondent's witnesses testified they could see the Aloha as soon as the schooner had passed the steamer. If this was the case, it would appear that the libelant had not been keeping a proper lookout. Furthermore, the position of the vessels immediately after the accident would seem to raise the presumption, which has not been satisfactorily rebutted, that the Aloha was more at fault in improperly deviating from her course than was the schooner. Pilot Rules, article 25 (30 Stat. 101 [33 USCA § 210; Comp. St. § 7899]).

In conclusion, the court feels that, whereas libelant has sustained the burden imposed upon him of proving some negligence on the part of the schooner, The Banner (D. C.) 225 F. 437; The Margaret M (D. C.) 257 F. 570; the court believes that there was some fault on his own part directly contributing to the collision, and therefore the case appears to be a proper one for division of damages, The Nevada (D. C.) 275 F. 965.

A decree will be entered accordingly.